IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2019

**STATE OF TENNESSEE v. LADARIUS BERRY**

**Appeal from the Criminal Court for Shelby County**
No. 14-04740      Lee V. Coffee, Judge

_____

**No. W2019-00310-CCA-R3-CD**

_____

A Shelby County grand jury indicted the defendant, LaDarius Berry, for attempted second degree murder (count 1), aggravated assault (count 2), employing a firearm during the commission of a dangerous felony (count 3), and reckless endangerment with a deadly weapon (count 4). After trial, a jury convicted the defendant as charged in counts 2, 3, and 4 and found him guilty of the lesser-included offense of attempted voluntary manslaughter in count 1. The trial court merged the defendant's convictions in counts 1 and 2 and imposed an effective twelve-year sentence. On appeal, the defendant challenges the sufficiency of the evidence supporting his convictions and the sentencing imposed by the trial court. After our review, we affirm the judgments of the trial court, but remand the case for the specific purposes of entry of amended judgments as to counts 1 and 2 to reflect the non-merger of the offenses as well as the determination by the trial court as to whether the sentences in counts 1 and 2 should be served consecutively or concurrently.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Remanded in Part**

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Josie S. Holland, Memphis, Tennessee, for the appellant, LaDarius Berry.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## Facts and Procedural History

On July 31, 2013, the defendant shot the victim, Lonzo Taylor, multiple times as the victim shopped at Cash America Pawn in Shelby County, Tennessee. At the time, the defendant was accompanied by his co-defendant, James Neely, and the store was filled with customers. At trial, both the victim and Mr. Neely explained that approximately one month prior to the shooting, the defendant and Mr. Neely paid the victim $800 in exchange for high-grade marijuana also known as "kush." The victim, however, failed to deliver the drugs to the defendant and Mr. Neely. As such, when the victim saw Mr. Neely enter Cash America Pawn, he approached Mr. Neely in order to discuss the failed deal. The two reached a verbal agreement wherein the victim agreed to pay Mr. Neely $500 later that day followed by an additional $300 payment at another time. Upon reaching the agreement, Mr. Neely and the victim walked towards the entrance of the store in order to exchange telephone numbers. As they approached the door, the defendant entered and demanded money from the victim. A struggle ensued between the defendant and the victim, and the defendant attempted to pull the victim outside of the store. The victim's shirt ripped as he resisted and attempted to run from the defendant. The defendant, however, fired multiple shots at the victim who suffered injuries to his thigh, scrotum, and buttocks.

Numerous customers and employees of Cash America Pawn witnessed the struggle and shooting between the defendant, Mr. Neely, and the victim. As Tiffany Lawrence waited on customers, she heard a commotion at the door and saw the defendant and Mr. Neely trying to pull the victim outside of the store. As the struggle continued, the victim's shirt came off, and he fell back inside. Ms. Lawrence heard three to four gunshots, noting both that she did not see who shot the victim and that she did not see the victim with a weapon. When the gunshots stopped, Ms. Lawrence saw the victim lying on the floor bleeding and asking for help. Ms. Lawrence called the police, noting everyone inside the store was frantic and scared.

When the police arrived, Ms. Lawrence assisted in retrieving the store's surveillance footage which was entered into evidence and played for the jury. In reviewing the footage, Ms. Lawrence identified the victim, Mr. Neely, and the defendant. Mr. Neely wore a white Gatorade towel on his head, the defendant wore a black hoodie, and the victim wore a red shirt. On December 2, 2013, Ms. Lawrence provided a statement to police and identified Mr. Neely in a photographic lineup. In identifying Mr. Neely, Ms. Lawrence wrote, "This is the guy that I seen (sic) fighting and shooting at the victim." She was not provided any additional photo spreads and could not identify the defendant in court.

Cash America Pawn customers, Cora Ray, Dorlorcleshi Craig, Antoniqua Hayes, Marlon Morrison, and Phyllis Ridley described the shooting in varying degrees of detail at trial. Ms. Ray identified herself, the victim, the defendant, and Mr. Neely on the surveillance footage, noting the footage did not capture everything that happened in the store prior to the shooting. She explained Mr. Neely bumped into her as she approached the store. Once inside, she overheard an escalating argument between the defendant and the victim, hearing "Man, come outside. Let me talk to you. Let me talk to you. Come outside. I got something to talk to you about." The victim refused to go outside, and he and the defendant began to struggle. After the victim's shirt ripped, the defendant pulled out a gun and shot the victim. Ms. Ray dropped to the ground and crawled to safety, asserting bullets were everywhere. Regarding Mr. Neely's involvement in the crimes, Ms. Ray stated, "nothing that [Mr. Neely] did stood out to me." After the shooting, Ms. Ray told law enforcement she heard 3 gunshots, but she was not asked to review any photographic lineups or provide any further statements. At trial, she identified the defendant as the shooter with 99% certainty. She was unable to describe the gun used during the shooting.

Ms. Craig saw the victim struggling at the door with the defendant and Mr. Neely. She overheard the defendant tell the victim to come outside and "make good on the drugs." Ms. Craig thought the victim was afraid of the defendant and Mr. Neely because he refused to exit the store. The argument escalated, and the victim attempted to lock the defendant outside of the store. The defendant, however, came inside. Once inside, the defendant and Mr. Neely "bombard[ed]" the victim and shot him. The victim fell to the ground, and the defendant and Mr. Neely fled the scene. Ms. Craig testified she did not know who actually fired the gun and stated she did not provide a statement to law enforcement or review any photographic lineups. Ms. Hayes was waiting for Ms. Craig in the parking lot when she heard a gunshot and saw two men run from the store. Ms. Hayes testified one of the men was wearing a black hoodie. Similarly, while inside the store, Mr. Morrison and Ms. Ridley both heard a commotion at the door followed by gunshots. Mr. Morrison noted he was scared, and others in the store were hysterical. Ms. Ridley reviewed a photographic lineup but was unable to make a positive identification.

Officer David Smith of the Memphis Police Department (MPD) responded to Cash America Pawn after the shooting. He photographed the evidence found at the scene. Several interior and exterior photographs of Cash America Pawn and the evidence found within were presented to the jury. The exhibits included pictures of the interior of Cash America Pawn which showed what appeared to be blood on the floor, a projectile, several spent shell casings, and a shelf possibly struck by a bullet. Officer Smith collected four spent shell casings from the scene but did not recover a gun.

MPD Felony Response Sergeants Michael Akin and Eric Kelly participated in the investigation of the shooting. Sergeant Akin responded to Cash America Pawn where he saw several spent shell casings, interviewed numerous witnesses, and recovered surveillance footage from the store's security cameras. He used the witnesses' descriptions of the men involved in the shooting to pull still images from the surveillance footage of two men matching the descriptions. The still images were used in a media release in an effort to identify the suspects.

Sergeant Kelly responded to the hospital where he interviewed the victim who seemed "afraid for his life." During the interview, the victim described Mr. Neely and the defendant and stated he did not know the defendant prior to the shooting. The victim believed he and his wife were followed to the pawn shop because he was involved in a bad deal with the defendants. Specifically, the victim explained he sold Mr. Neely marijuana earlier that month, but Mr. Neely was not satisfied with the quality of the drugs and wanted a refund. When the three crossed paths at the pawn shop, the victim struggled with the defendant and Mr. Neely as they attempted to drag him out of the store. The victim refused to go outside because he thought something bad would happen to him if he did so. During the struggle, the victim's shirt was torn from his body after which the defendant fired multiple shots at the victim. Sergeant Kelly's report indicated the victim suffered 5 entry and exit wounds below his waist.

After interviewing the victim, Sergeant Kelly continued to aid in the investigation. He explained how the media release led to several tips, two of which resulted in identifications by the victim of his assailants. A tip provided on November 11, 2013, named Mr. Neely as a suspect, and the victim subsequently identified Mr. Neely in a photographic lineup as one of his assailants. On December 27, 2013, a separate tip named the defendant as a suspect, and the victim also identified the defendant in a photographic lineup.

The victim and Mr. Neely provided additional details during their testimony at trial. The victim admitted he was previously convicted in 2006 for aggravated burglary and theft of property valued over $10,000 and in 2013 for theft of property valued over $500. He stated he was shopping with his wife, Sherelle Taylor, when Mr. Neely, known to the victim as "Tuna," entered the store. The victim stated he and Mr. Neely had engaged in numerous drug-related deals over the course of several months. Accordingly, upon seeing Mr. Neely, the victim addressed a "bad deal they had and how to make it right." The two reached a verbal agreement and moved towards the door to exchange phone numbers. As they did so, the defendant entered the store and demanded money. The victim, however, did not know the defendant, and though the victim explained he would pay Mr. Neely, a struggle ensued. The victim saw a gun on Mr. Neely's waist, but Mr. Neely did not pull the gun. The victim was not carrying a weapon at the time. As

Mr. Neely tried to discuss the verbal agreement with the defendant, the defendant grabbed the victim's shirt and attempted to pull him outside. The victim resisted, his shirt came off, and the defendant grabbed the gun from Mr. Neely's waist. The victim saw the defendant holding the gun prior to the shooting. As the victim ran, the defendant fired multiple shots, and the victim suffered injuries to his buttocks, thigh, and scrotum. The victim recalled specifically that the first gunshot hit him in the buttocks followed by a second shot to his thigh. The victim was transported to the hospital where he received stitches and remained for two days. His medical records were entered into evidence at trial.

During the pending investigation, law enforcement presented several photographic lineups to the victim on September 4, 2013, November 29, 2013, and January 22, 2014. The September 4 lineup did not include pictures of the defendant or Mr. Neely, and the victim did not make a positive identification as a result. However, the victim identified Mr. Neely in a photographic lineup presented to him on November 29. In identifying Mr. Neely, the victim wrote, "This is one of the guys that shot me." The victim eventually learned the defendant's nickname is "Boochie" or "Boosie," and identified the defendant in a separate photo spread presented to him on January 22. In identifying the defendant, the victim wrote, "he shot me 4 times inside the pawn shop." After a question from the jury, the victim clarified that the defendant shot him, not Mr. Neely. As such, the victim explained the words he wrote below Mr. Neely's photospread identification were not "worded properly." The victim's advice of rights forms and the photo spreads were entered into evidence.

Finally, Mr. Neely testified, noting he was indicted with the defendant in this case. Before detailing his involvement in the crimes, Mr. Neely stated that his nickname is "Tuna" and that the defendant's nickname is "Boochie." He also admitted to previously being a drug dealer and serving as a middle man between the defendant and the victim as the two did not know each other. Regarding the failed drug deal at issue, Mr. Neely explained that he and the defendant assumed they lost $800 in the deal.

On July 31, 2013, Mr. Neely saw the defendant in their neighborhood, and they decided to go to the mall. The two drove separately and stopped at Cash America Pawn prior to reaching the mall. Mr. Neely stated that he and the defendant did not discuss going to the pawn shop prior to doing so and that he did not know the victim was inside the pawn shop at the time. Mr. Neely identified himself on the surveillance footage, noting he was wearing a white shirt, blue jeans, and a white Gatorade towel on his head. Inside the store, the victim approached Mr. Neely and began discussing the failed deal. The victim promised to give Mr. Neely $500 and to provide the remaining $300 at a later time. After reaching this agreement, the two men moved towards the door in order to exchange phone numbers. As they did, the defendant, who was wearing black, walked

inside and demanded, "Where my mother-f****** money at." The victim responded, "what money," but the defendant continued his demands even after Mr. Neely explained an agreement had been reached. The defendant began pulling the victim's shirt, the victim's shirt came off, and Mr. Neely exited the store. At the time, both Mr. Neely and the defendant were carrying guns, but Mr. Neely did not see the victim with a gun. As Mr. Neely got into his car, he heard gunshots and drove away from the scene. At the time of the shooting, Mr. Neely did not see the defendant with a gun, but after viewing the surveillance footage, Mr. Neely learned the defendant pulled out his gun.

The following day, the defendant called Mr. Neely and asked Mr. Neely not to "tell on him." After being arrested and while in jail for these crimes, the defendant accused Mr. Neely of "snitching" and threatened Mr. Neely multiple times, noting there would be consequences if Mr. Neely testified against him. As a result, Mr. Neely feared for his safety while in jail. During the pending investigation, however, Mr. Neely refused to give a statement or disclose the defendant's name to law enforcement. Mr. Neely eventually spoke with the State and admitted his bond was lowered after doing so. In speaking with the State, Mr. Neely also admitted to making false statements. Specifically, Mr. Neely testified he previously lied to prosecutors by stating he did not have a gun on July 31 and by claiming his girlfriend was in his car outside of the pawn shop. Mr. Neely explained he was scared at the time he made the false statements. Finally, Mr. Neely stated he was not promised anything in exchange for his testimony, but he chose to testify in order to tell the truth.

At the close of the State's proof, the defendant made a motion for a judgment of acquittal. The trial court denied the motion, and the jury convicted the defendant of attempted voluntary manslaughter, aggravated assault, employing a firearm during the commission of a dangerous felony, and reckless endangerment with a deadly weapon. At a subsequent sentencing hearing, the trial court imposed a four-year sentence for the attempted voluntary manslaughter conviction, a four-year sentence for the aggravated assault conviction, a six-year sentence for the employing a firearm conviction, and a two-year sentence for the reckless endangerment conviction. The trial court merged the defendant's convictions for attempted voluntary manslaughter and aggravated assault and ordered the remaining sentences to be served consecutively for an effective twelve-year sentence. The defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

***Analysis***

I. *Sufficiency of the Evidence*

The defendant challenges the sufficiency of the evidence supporting his convictions for attempted voluntary manslaughter, aggravated assault, employing a firearm during the commission of a dangerous felony, and reckless endangerment with a deadly weapon. The defendant generally argues his convictions "rest solely on the testimony of liars and thieves" who failed to prove that the defendant "was even present at the pawn shop at the time of the shooting" or that he "possessed or fired a weapon." The State contends the evidence produced at trial was sufficient to support the defendant's convictions, noting several witnesses, whose credibility was determined by the jury, identified the defendant as the shooter, and we agree.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d

- 7 -

776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

The defendant was convicted of attempted voluntary manslaughter, aggravated assault, employing a firearm during the commission of a dangerous felony, and reckless endangerment with a deadly weapon. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211 (a). Upon establishing the requisite intent, one is guilty of attempted voluntary manslaughter when he "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101 (a)(3). Aggravated assault occurs when a person "intentionally, knowingly or recklessly causes bodily injury to another" by using or displaying a deadly weapon. Tenn. Code Ann. §§ 39-13-101 (a)(1), -102 (a)(1)(A)(iii). "It is an offense to employ a firearm during the . . . commission of a dangerous felony." Tenn. Code Ann. § 39-17-1324 (b)(2). One such "dangerous felony" is attempted voluntary manslaughter. Tenn. Code Ann. § 39-17-1324 (b)(1), (i)(1)(C) & (M). A person commits felony reckless endangerment who "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" and does so with a deadly weapon. Tenn. Code Ann. § 39-13-103 (a), (b)(2).

Here, the record makes clear the defendant shot the victim multiple times inside Cash America Pawn. At the time of the shooting, the store was filled with customers and employees, including Ms. Ridley, Ms. Taylor, and Ms. Lawrence. As it relates to the defendant's conviction for attempted voluntary manslaughter, the record indicates sufficient evidence exists to support the jury's finding that the defendant intentionally or

knowingly attempted to kill the victim after adequate provocation. The defendant and the victim engaged in an altercation prior to the shooting resulting from a bad drug deal. The defendant grabbed the victim, ripped the victim's shirt off, and attempted to pull the victim outside of the store. When the victim resisted and ran from the defendant, the defendant pulled out a gun and fired multiple shots at the victim. The victim suffered multiple gunshot wounds resulting in injuries to his thigh, scrotum, and buttocks. In reaching its verdict, it is clear the jury found the defendant's altercation with the victim prior to the shooting served as adequate provocation, a task that fell within their province as the trier of fact. *See State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995); *Dorantes*, 331 S.W.3d at 379. Therefore, sufficient evidence exists in the record showing the defendant committed the attempted voluntary manslaughter of the victim as the defendant shot the victim multiple times after the two engaged in an altercation.

The above-outlined evidence also supports the defendant's remaining convictions. As to the employing a firearm conviction, it is clear the defendant used a gun to commit the attempted voluntary manslaughter of the victim. Tenn. Code Ann. § 39-17-1324 (b)(1), (b)(2), (i)(1)(C) & (M). In doing so and as it relates to the aggravated assault conviction, the record clearly indicates the defendant intentionally or knowingly shot the victim multiple times from which the victim suffered bodily injury to his thigh, scrotum, and buttocks. Tenn. Code Ann. §§ 39-13-101 (a)(1), -102 (a)(1)(A)(iii). Finally, sufficient evidence also exists to support the defendant's conviction for reckless endangerment with a deadly weapon as it is undisputed Ms. Ridley, Ms. Taylor, and Ms. Lawrence were inside the store as the defendant fired multiple shots at the victim which placed them in imminent danger of death or serious bodily injury. Tenn. Code Ann. § 39-13-103 (a), (b)(2). The defendant is not entitled to relief.

As noted, the defendant's challenge rests solely on his attack of the credibility of the witnesses who testified against him. The defendant asserts the State failed to prove the defendant was the shooter. The record, however, disagrees. "The identification of the defendant as the person who committed the crime is a question of fact for the jury." *State v. Lindsey*, 208 S.W.3d 432, 444 (Tenn. Crim. App. 2006) (citing *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)). Not only did the victim, Mr. Neely, Ms. Lawrence, and Ms. Ray identify the defendant as the shooter on the surveillance footage and at trial, but the victim also identified the defendant as the shooter in a photo spread. *Id.* (citations omitted) ("The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made."). Furthermore, the jury disposed of any credibility issues regarding each witness in reaching its verdict, and we will not reweigh the evidence or substitute any inferences for those of the jury. *Dorantes*, 331 S.W.3d at 379. The defendant is not entitled to relief.

## II. Sentencing

For several reasons, the defendant argues the trial court abused its discretion in sentencing him to an effective twelve years' incarceration. The defendant asserts the trial court erred in relying on certain enhancement factors and in ordering his sentences to be served consecutively. The defendant also asserts he was prejudiced by a delay in sentencing as the hearing occurred more than forty-five days after guilty verdicts were rendered against him. The State disagrees, arguing the record supports the trial court's sentencing determinations, and the defendant suffered no prejudice as a result of the delayed sentencing hearing. Upon our review, we agree with the State.

### a. Delay in Sentencing

In any felony case, "[b]efore imposing sentence or making other disposition upon acceptance of a plea of guilty or upon a verdict or finding of guilty, the court shall conduct a sentencing hearing without unreasonable delay, but in no event more than forty-five (45) days after the finding of guilt." Tenn. Code Ann. § 40-35-209 (a). However, "it is the general rule in Tennessee that statutory provisions which relate to the mode or time of doing an act to which the statute applies are not to be mandatory, but directory only." *State v. Jones*, 729 S.W.2d 683, 685 (Tenn. Crim. App. 1986) (citations omitted). Accordingly, absent evidence of prejudice resulting from delay, the error is deemed harmless. *Id.*

The defendant claims he was prejudiced by the delay in sentencing because the trial court incorrectly referred to the weapon used during the crimes as a "semi-automatic weapon." We, however, are not persuaded. While the defendant is correct in that the record does not detail what type of gun he used to shoot the victim, it is undisputed a gun was used, and the defendant has failed to establish how the alleged misstatement by the trial court resulted in any prejudice to his sentence. Rather, in sentencing the defendant, the trial court provided a brief recitation of the facts as presented at trial. The trial court stated it was merely summarizing the facts from its notes which were "not intended to be a verbatim dissertation of what happened at trial." In doing so, the trial court referred to the weapon used by the defendant as a "gun" numerous times, stating the weapon was a "semi-automatic weapon" only once. Ultimately, we find no distinction between the phrasing of the trial court and find no prejudice as a result. Absent prejudice, the defendant cannot establish error as it relates to the timing of his sentencing hearing. *Id.* Furthermore, the record indicates the trial court addressed the delay at the outset of the sentencing hearing, noting the delay was due to the caseload of the court and the general scheduling issues of the parties. Accordingly, the defendant is not entitled to relief as he has failed to demonstrate any prejudice as a result of the delay.

## b. *Length of Sentences*

The defendant argues the trial court abused its discretion in enhancing his sentences above the statutory minimums. Before imposing a sentence upon a defendant, the trial court must first consider these factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103.

When the record establishes the sentence imposed by the trial court was within the appropriate range and reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The trial court must state on the record the factors it considered and the reasons for ordering the sentence imposed. Tenn. Code Ann. § 40-35-210 (e); *Bise*, 380 S.W.3d at 706. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Here, the record indicates the trial court sentenced the defendant as a Range I, standard offender for his crimes of attempted voluntary manslaughter, aggravated assault, employing a firearm during the commission of a dangerous felony, and reckless endangerment with a deadly weapon. Attempted voluntary manslaughter is a Class D felony. Tenn. Code Ann. §§ 39-12-107 (a); 39-13-211 (b). The potential sentencing range for a Range I offender convicted of a Class D felony is between two and four years. Tenn. Code Ann. § 40-35-112 (a)(4). Aggravated assault is a Class C felony. Tenn. Code Ann. § 39-13-102 (e)(1)(A)(ii). The potential sentencing range for a Range I offender convicted of a Class C felony is between three and six years. Tenn. Code Ann. § 40-35-112 (a)(3). Employing a firearm during the commission a dangerous felony is a Class C felony that carries a mandatory six-year sentence to be served at one hundred percent. Tenn. Code Ann. § 39-17-1324 (h)(1). Reckless endangerment committed with a deadly weapon is a Class E felony. The potential sentencing range for a Range I offender convicted of a Class E felony is between one and two years. Tenn. Code Ann. §

- 11 -

40-35-112 (a)(3).  The defendant received a four-year sentence for the attempted voluntary manslaughter conviction, a four-year sentence for the aggravated assault conviction, a statutorily-imposed, six-year sentence for the employing a firearm conviction, and a two-year sentence for the reckless endangerment conviction. Therefore, the sentences imposed by the trial court fell within the appropriate sentencing ranges for the defendant's offenses and are presumed reasonable by this Court. *Bise*, 380 S.W. 3d at 707; *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

The defendant argues the trial court improperly enhanced his sentences by relying on a prior misdemeanor conviction for unlawful possession of a weapon and the enhancement factor establishing the defendant as a leader in the commission of the crimes.  The defendant also asserts the trial court "improperly considered a pending matter" in calculating his sentence.  We disagree.

The record indicates the trial court properly considered the statutory factors required under Tennessee Code Annotated section 40-35-210 prior to sentencing the defendant.  Specifically, the trial court reviewed the presentence report, the evidence presented at the sentencing hearing, the arguments of counsel, the nature and characteristics of the criminal conduct involved, and the applicable enhancement and mitigating factors.  In assessing the applicable enhancement and mitigating factors, the trial court determined no mitigating factors applied to the defendant's convictions.  Tenn. Code Ann. § 40-35-113.  However, the trial court found numerous enhancement factors applied, including: (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;" (2) "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors;" and (10) "[t]he defendant had no hesitation about committing a crime when the risk to human life was high."  Tenn. Code Ann. § 40-35-114 (1), (2), & (10). The trial court also noted the defendant committed his crimes in "a public place in which there were at least ten people present."  Accordingly, though not explicitly stated, it is clear the trial court considered factor (3), "[t]he offense involved more than one (1) victim," as it repeatedly discussed the four named victims and the numerous unnamed victims present in the store at the time of the shooting.  Tenn. Code Ann. § 40-35-114 (3). Finally, as it relates to count 1, the trial court determined factor (9) also applied, "[t]he defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense."  Tenn. Code Ann. § 40-35-114 (9).  Upon consideration of the statutory criteria, the trial court found the defendant to be a Range I, standard offender.  Based on this finding, the trial court imposed within-range sentences for each of the defendant's convictions to be served in confinement.  Nothing in the record indicates the length of the sentences imposed or the trial court's imposition of service in confinement was improper.  The defendant is not entitled to relief.

### c. Consecutive Sentences

The defendant asserts it was error for the trial court to run his sentences in counts 1 and 4 consecutively.[1] We again disagree. This Court reviews consecutive sentences imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W. 3d 682, 707 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 859-60 (Tenn. 2013). The party appealing a sentence bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Tennessee Code Annotated section 40-35-115 "creates several limited classifications for the imposition of consecutive sentences." *State v. Moore*, 942 S.W.2d 570, 571 (Tenn. Crim. App. 1996). A trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Pursuant to statute, consecutive sentencing is warranted when "[t]he defendant is an offender whose record of criminal activity is extensive" or "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115 (b)(2) & (4). In considering a defendant's dangerous offender status, a trial court can rely on the defendant's prior criminal history. *See State v. Crawford*, No. E2012-00001-CCA-R3-CD, 2013 WL 4459009, at *32 (Tenn. Crim. App. Aug. 19, 2013) (relying on three "prior violent felony convictions" and reciting "the facts leading to those convictions" in finding the defendant to be a dangerous offender). In imposing consecutive sentences based upon a dangerous offender status, it is necessary that "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn.1999) (stating that the *Wilkerson* findings that the sentences are necessary to protect the public and reasonably relate to the severity of the offenses apply only to consecutive sentences involving dangerous offenders).

Here, the trial court found the defendant was eligible for consecutive sentencing based upon his status as an "offender whose record of criminal activity is extensive" and as a "dangerous offender." Tenn. Code Ann. § 40-35-115 (b)(2) & (4). In making its determinations, the record shows the trial court relied on the underlying facts of the defendant's present convictions, the number of convictions the defendant currently faces,

---

[1] We note, the trial court properly ordered the defendant's sentence for his conviction in count 3, employing a firearm during the commission of a dangerous felony, to be served consecutively to his conviction in count 1, attempted voluntary manslaughter. Tenn. Code Ann. § 39-17-1324 (e)(1).

the defendant's prior gun-related misdemeanor conviction, and the defendant's pending fifty-count indictment committed while on bond for the present convictions. As a result, the trial court appropriately determined the defendant "has a long history of criminal conduct." *See State v. Daniel Ray Prince*, No. M2012-02488-CCA-R3-CD, 2013 WL 2447859, at \*6 (Tenn. Crim. App. June 6, 2013) (citations omitted) ("Although some of the criminal activity includes charges that have not yet resulted in convictions, convictions alone are not required to justify the finding of an extensive criminal history."). The trial court also determined that the nature and circumstances of the defendant's conduct were "aggravated" and involved "multiple other victims for which he was not indicted, but were present in the store when this crime took place." As such, the trial court found the sentences imposed reasonably related to the severity of the crimes for which the defendant stands convicted and that confinement would protect the public from further criminal behavior of the defendant. *Wilkerson*, 905 S.W.2d at 938; *Lane*, 3 S.W.3d at 461. Therefore, the record supports the trial court's classification of the defendant as a dangerous offender with a record of criminal activity that is extensive. Because the extensive criminal activity and dangerous offender statutory factors have been met, consecutive sentencing was warranted. Tenn. Code Ann. § 40-35-115 (b)(2) & (4); *Crawford*, 2013 WL 4459009, at \*32 ("The presence of a single factor is enough to justify the imposition of consecutive sentencing."). The defendant is not entitled to relief as to this issue.

### d. Merger

Though not addressed by either party, this Court has determined the trial court erred in merging the defendant's convictions for attempted voluntary manslaughter and aggravated assault pursuant to *State v. Feaster*, 466 S.W.3d 80, 87-88 (Tenn. 2015). It is clear from the record that the defendant's two crimes for attempted voluntary manslaughter and aggravated assault arose from one event, the defendant's shooting the victim. However, our Supreme Court has determined that the principles of double jeopardy do not prohibit the defendant from being convicted of both crimes. *Id.* (noting attempted voluntary manslaughter and aggravated assault each contain elements the other does not and "there is no evidence that the General Assembly intended to prohibit multiple punishments in circumstances such as these"); *see also* Tenn. Code Ann. §§ 39-13-211 (a), 39-12-101 (a)(3), 39-13-101 (a)(1), -102 (a)(1). As a result, the defendant is not entitled to the merger of the two convictions, and we remand the case to the trial court for the entry of amended judgment forms in counts 1 and 2 to reflect the non-merger of the offenses as well as the determination by the trial court as to whether the sentences in counts 1 and 2 should be served consecutively or concurrently.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court but remand the case for the entry of amended judgment forms and sentencing determinations as to counts 1 and 2.


_____
J. ROSS DYER, JUDGE